**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**Western Division**

| | | |
|---|---|---|
| ALEEHA DUDLEY, | : | Case No.: 1:14-cv-38 |
| | : | |
| Plaintiff, | : | Judge: |
| | : | |
| v. | : | Magistrate Judge: |
| | : | |
| MIAMI UNIVERSITY, | : | |
| | : | |
| and | : | |
| | : | |
| DR. DAVID C. HODGE, | : | |
| in his official capacity as president | : | |
| of Miami University, | : | |
| | : | |
| Defendants. | : | |

_____

**COMPLAINT**
_____

Plaintiff Aleeha Dudley ("Ms. Dudley"), by and through her undersigned counsel, files this complaint against Defendants Dr. David C. Hodge, in his official capacity, and Miami University (collectively, "Miami") for denying her equal access to Miami's programs and activities in violation of federal law.  She alleges as follows:

**INTRODUCTION**

1.      Aleeha Dudley is an undergraduate student at Miami. She first enrolled in the fall of 2011 to pursue a bachelor's degree in zoology so that she might thereafter secure admission to veterinary school.  Ms. Dudley is blind.  She was persuaded to select Miami by its assurances that it could give her an opportunity equal to her sighted peers to pursue her career goal.

2.      Instead, as set forth in detail below, Miami has denied Ms. Dudley an opportunity equal to that afforded her sighted peers to course materials and educational technology and, as a

result, have denied her the opportunity to learn in an equally effective and integrated manner alongside her sighted peers. That denial has stemmed, in part, from Miami's selection of software programs that gratuitously exclude Ms. Dudley from integrated access to Miami's programs and activities. Moreover, Miami has failed to provide Ms. Dudley timely and adequate access to (1) Braille textbooks, (2) useful tactile graphics, (3) timely course materials in an accessible format including handouts, assignments, PowerPoint presentations, and class notes, and (4) trained assistants to allow full and meaningful participation in all class activities.

3.  Miami requires students seeking Bachelor of Science degrees in zoology to successfully complete, among other requirements, four semesters of chemistry, including organic chemistry, each with a lab component; 36 credit hours of courses in the zoology department, including two semesters of introductory level biological concepts; two semesters of introductory level English; two semesters of second year foreign language; a course in statistics; and a course in calculus. These requirements are widely disseminated and available on Miami's Department of Zoology website.

4.  Braille is Ms. Dudley's primary reading method. Miami has not reliably provided Ms. Dudley with embossed Braille content.

5.  For digital text, Ms. Dudley uses screen reading software, either Voiceover or Job Access with Speech ("JAWS"), each of which can display text on a refreshable Braille display or can vocalize the text using synthesized speech. Screen reading programs enable Ms. Dudley to use keyboard commands to easily navigate text, to change the speed of speech to enhance her comprehension, and to receive audible cues concerning paragraphing, punctuation and other organizational information. In short, screen reading software allows Ms. Dudley to read textual content with the same independence and cognitive features as are found in visual reading.

6.      When digital textual content is properly formatted, it is universally available to sighted and blind alike and does not require the re-creation of text in a separate format.  Unlike printed content, digital content is not inherently visual, audible or tactile, but must be converted to be accessible to any or all of those senses.  Thus, for example, this Complaint is in a PDF format that without modification can be read both by those with sight using their eyes and by blind persons using screen access software.

7.      Recognized standards exist for the preparation and presentation of universally designed mainstream digital content.  For example, the International Digital Publishing Forum has established the ePub 3 standard for published digital content, and the World Wide Web Consortium has promulgated Web Content Accessibility Guidelines 2.0.

8.      Accessible math content, critical to Ms. Dudley's educational and vocational path, is best presented in MathML.  Free open-source software has been written to make it easy to convert equations from the language in which they are typically written (LaTex) into MathML.  When source files are not available, equations can be pasted into Microsoft Word and then, with the aid of an inexpensive (approximately $30) plug-in, can be exported from Word into MathML.

9.      Like a public accommodation that decides to create unneeded entrance steps and no ramp, accessibility problems arise when a university makes, as Miami has, procurement decisions about digital content without considering whether students with disabilities will have integrated access to the content.  Miami compounds that failure by not converting inaccessible content to accessible content in alternative formats so that those students may have access to course-related content at the same time as their nondisabled peers.

10. Universities use a wide array of software programs to distribute project assignments, homework, tests, grades, and other communications between and among students and faculty. Although content delivery systems designed for universal mainstream accessibility are commercially available, Miami has repeatedly acquired inaccessible software. Consequently, Miami has forced on Ms. Dudley less effective and segregated communication methods, which have made it gratuitously harder not only for her to acquire such basic information as the content of an assignment, but also that she even has such an assignment.

11. Ms. Dudley relies on tactile graphics to comprehend images and diagrams that appear digitally and in print. These raised-line illustrations and their accompanying Braille labels can then be read by touch. The preparation of tactile illustration requires precision and expertise. Modes of producing tactile images range in quality and accuracy. Because diagrams and graphics are critical to natural science, meaningful tactile graphics are an essential component of Ms. Dudley's education. Miami has not provided Ms. Dudley with an equal opportunity to access graphical information. In science classes, this failure has meant that she is deprived of an important body of information that is communicated timely and effectively to her fellow students.

12. Miami's failure to provide Ms. Dudley an equal opportunity to access the content, classroom learning and activities in these required courses has forced her in each instance to choose between withdrawing from a course or achieving a grade well below one that would accurately reflect her intelligence, aptitude and industry, and instead reflects only the barriers to learning that Miami has erected. Miami's failure to afford Ms. Dudley an equal opportunity to compete at a level commensurate with her capabilities has caused her (1) to expend tuition, fees, and expenses in exchange for an educational experience inferior to that which Miami has offered

her sighted peers; and (2) severe emotional distress. Moreover, by impairing her opportunity to secure admission to veterinary graduate school, Miami, instead of enhancing her life, has caused irreparable harm.

13.     Ms. Dudley relied on Miami's assurances of equal access and has upheld her end of the bargain by enrolling, paying tuition and working to the best of her abilities. Miami, far from providing an equal opportunity to access educational benefits, has offered Ms. Dudley a nightmarish experience of failed and broken promises, unfair disadvantage and an educational experience that is second to all.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because Ms. Dudley's claims arise under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, *et seq.*, and Section 504 of Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794.

15.     Ms. Dudley is a resident of Oxford, Ohio. Miami is located in Oxford, Ohio, and the acts and injuries complained of herein occurred in Oxford, Ohio.

16.     Venue in this Court is proper pursuant to 28 U.S.C. §1391(b) because Defendant does business in this district, the acts constituting violations of the ADA and Section 504 occurred in this district, and Ms. Dudley resides in this district.

## THE PARTIES

17.     Ms. Dudley has been blind since birth. She grew up in New Paris, Ohio and graduated with honors from National Trail High School with a 3.6 grade point average. Miami awarded her a scholarship, as did the National Federation of the Blind and the Lions Club. For the rest of her expenses, she has incurred debt. Ms. Dudley enrolled at Miami in the fall of 2011

and chose Miami specifically because of the high acceptance rate its graduates enjoy when applying to veterinary school. Ms. Dudley intends to enroll in veterinary school after her graduation from Miami.

18. Dr. David C. Hodge is, and has been at all relevant times, president of Miami University. He is being sued here in his official capacity.

19. Defendant Miami University is part of the Executive Branch of the State of Ohio and governed by Ohio Rev. Code Ann. §§ 3339, *et seq.* Therefore, it is a government entity under Title II of the ADA, 42 U.S.C. § 12131, *et. seq.*

20. Miami receives federal financial assistance in many forms, including, but not limited to, direct grants of assistance as well as student financial aid, and is therefore required to comply with Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

21. As a condition of receiving federal funds from the Department of Education, Miami annually signs a Certificate of Compliance certifying that it is in compliance with Section 504 of the Rehabilitation Act.

## STATEMENT OF FACTS

**I.     Prior to matriculation at Miami**

22. Before applying to Miami, Ms. Dudley met with employees of its Office of Disability Resources ("ODR") about Miami's support services and its ability to provide Ms. Dudley the necessary auxiliary aids and services to afford her an equal opportunity as a blind student pursuing a degree in zoology. Ms. Dudley discussed with ODR her previous Individualized Education Program ("IEP") and the modifications she would need to ensure that she would receive an equal opportunity to access required materials and course content. Miami promised Ms. Dudley that it would acquire a full and equal complement of educational resources to ensure such access.

23.     In June 2011, after Ms. Dudley was admitted, ODR drafted a letter to distribute to the instructors of Ms. Dudley's first semester courses.  The letter suggested only two modifications: offering all classroom textbooks, handouts, exams,  quizzes and other materials in Rich Text Format ("RTF") that would be readable to her software and   double-time for exams and quizzes.

24.     Ms. Dudley did not discuss or approve the letter before it was sent out to her instructors.  The letter included nothing about Braille textbooks, tactile graphics, human assistants, timely course materials, or accessible learning management software.

## II.     2011-2012 Academic Year

25.     In her first semester, Ms. Dudley enrolled in CHM 141R College Chemistry, CHM 144 College Chemistry Laboratory, ENG 111 College Composition, SPN 201 Second Year Spanish, and ZOO 115 Biological Concepts: Ecology, Evolution, Genetics, and Diversity.

26.     Ms. Dudley continued this curriculum in her second semester, enrolling in CHM 142 College Chemistry, CHM 145 College Chemistry Laboratory, ENG 112 College Composition, SPN 202 Second Year Spanish, and ZOO 116 Biological Concepts: Ecology, Evolution, Genetics, and Diversity, as well as MUS 100N Steel Drums.

27.     For each of her first year courses, Ms. Dudley received scanned versions of the course textbook from Miami's E-Text Service. Miami scanned the textbooks after Ms. Dudley purchased the hard copies from the bookstore.

28.     These textbooks once digitized were nearly useless and vastly inferior to the printed text available to sighted students.  They were not properly remediated, nor were they prepared with the structural data and metadata that would have permitted her full comprehension of the layout and effective navigation within the text.  For example, Ms. Dudley could not

navigate within the chapters of the text. When she attempted to use refreshable Braille, her primary reading method, the text become even more difficult to navigate.

### A. College Chemistry

29. The College Chemistry lecture and lab instructors knew Ms. Dudley was a blind student enrolling in the class when they received the letter from ODR before the beginning of the course semester. And, of course, Miami knew that she would require auxiliary aids and services to receive an equal opportunity to access the content of each of these classes.

30. Unfortunately, Miami furnished Ms. Dudley an unremediated and unnavigable scanned version of the textbook for her College Chemistry lectures that did not include any of the accompanying images in the book. Ms. Dudley did not receive tactile reproductions of those images either.

31. Miami assigned Ms. Dudley one graduate student assistant for College Chemistry, a Ph.D. candidate in the chemistry department. Before working with Ms. Dudley, the assistant had no prior experience with Braille, tactile images, or teaching chemistry to blind students. ODR did not provide the assistant with any meaningful training to prepare him to assist Ms. Dudley.

32. To better fulfill his duties, the assistant conducted independent research to find out what Ms. Dudley needed to learn in an integrated setting. But because Miami failed to provide appropriate equipment to emboss tactile graphics, the assistant had to create very rudimentary tactile graphics by hand using a tactile drawing kit.

33. Ms. Dudley's chemistry lecture instructors used two online software programs to manage and collect course assignments, Smartworks and Turnitin. Both programs were not designed to be compatible with screen reading software, so Ms. Dudley could not independently

access course assignments. Rather, only when her assistant was available could she learn about course assignments or turn them in.

34. Ms. Dudley's lab instructor refused to permit her to participate fully in her lab class alongside her sighted classmates. Moreover, it was only through the efforts of Ms. Dudley's assistant that Miami eventually acquired a talking LabQuest device (providing audible real-time data readings, descriptors and menus) so that thereafter Ms. Dudley was able to conduct experiments independently.

35. Ms. Dudley repeatedly advised Miami about the lack of equally effective communications and an equal opportunity to access course-related content in College Chemistry and its laboratory component. She phoned, e-mailed and visited ODR repeatedly, seeking to resolve these issues, but without success.

36. Although her assistant made Herculean efforts to provide timely, accessible graphical information, Miami's insistence on inaccessible educational software and its failure to provide a Braille textbook, effective tactile graphics, and appropriate lab equipment forced Ms. Dudley to perform below her potential. She received B's in her two semesters of College Chemistry and C's in the lab. These grades did not reflect her aptitude or capability, but rather Miami's failure to timely and appropriately provide necessary auxiliary aids and services to ensure that Ms. Dudley received an equal opportunity to access course materials.

**B. Biological Concepts**

37. Although Miami knew that Ms. Dudley required auxiliary aids and services to receive an equal opportunity to access the course material in Biological Concepts, she did not receive a Braille textbook. She instead received an unremediated and unnavigable electronic text, with no tactile reproductions of the images in the textbook. Moreover, Miami failed to

provide an assistant for Biological Concepts that had adequate training and a background in the course.  The tactile graphics that Ms. Dudley received from her assistant to represent images that appeared in lecture material were not properly tagged and labeled to make them legible to Ms. Dudley.

38.     Ms. Dudley's lecture instructors used LearnSmart to manage homework assignments.  The online software program was Flash-based and inaccessible to screen reader software.  As a result, Ms. Dudley could not complete all of the assignments, and she alone among her peers could not avail herself of the collaborative learning offered by this technology.

39.     On at least one occasion in Biological Concepts, Ms. Dudley received a failing grade on an assignment because she did not have access to a chart containing information necessary to complete the work on time.

40.     Her instructor for the Biological Concepts lab did not permit Ms. Dudley to participate fully in lab experiments, in part because of mistaken beliefs about the capabilities of blind people.  For example, she was not allowed to perform a "gram stain," which tests whether bacteria are receptive to an antibiotic.  Ms. Dudley was told that it was a safety issue for her to touch live bacteria.  Other students wore gloves, but she was not afforded the same option.  Moreover, for a lab assignment whose purpose was for students to study live bacteria as they change under the microscope, Ms. Dudley instead received a single static image.

41.     Ms. Dudley's energetic and repeated attempts to secure ODR's assistance in providing her an equal opportunity to access the content in Biological Concepts and its laboratory component provided no relief.

42.     As a result of Miami's insistence in deploying inaccessible digital educational tools and failure to provide a Braille textbook, effective tactile graphics, a trained human

assistant, and appropriate lab equipment to allow full participation, Ms. Dudley's academic

performance did not reflect her aptitude, skills and work habits. She received a D in Biological

Concepts first semester and a C, her second semester. The competition for admission to

veterinary graduate school is such that grades of this sort create a nearly insurmountable barrier

for Ms. Dudley to pursue her chosen vocation.

### III. Academic Year 2012-2013

43. Despite Miami's deliberate indifference to affording her an equal opportunity to

access its programs and activities during her freshman year, Ms. Dudley's determination to learn

was undimmed, and she returned for a second year. During the first semester of her second year,

Ms. Dudley enrolled in CHM 241 Organic Chemistry, CHM 244 Organic Chemistry Laboratory,

ZOO 203 Introduction to Cell Biology, SPN 311 Grammar Review and Introductory

Composition, and MUS 100N Steel Drums. Ms. Dudley continued Organic Chemistry and

Organic Chemistry Laboratory during second semester, enrolling in CHM 242 and CHM 245.

### A. Organic Chemistry

44. Despite knowing that Ms. Dudley would require auxiliary aids and services to

receive an equal opportunity to access course content, Miami only requested, by letter from ODR

to her professor, that she receive all class materials in an "alternate format" compatible with

JAWS, one of her screen access software programs. But Miami did not meet even this minimal

requirement; instead, Ms. Dudley's Organic Chemistry instructors distributed and managed

homework assignments through Sapling, yet another inaccessible online software program.

45. Eventually, ODR arranged for Ms. Dudley to receive assignments as Microsoft

Word files. Unfortunately, the images accompanying the assignments were not printable as

tactile graphics. Therefore, Ms. Dudley needed an assistant to prepare tactile graphics

spontaneously.  As a result, it took Ms. Dudley nearly four times longer than her sighted peers to complete the assignments.

46.     Miami's failure to provide her with accessible copies of the many graphics in the Organic Chemistry textbook greatly complicated her attempt to master the material.  Although the textbook publisher provided a usable electronic file of the textbook, it did not include captions or tactile graphics for the accompanying images.  Miami deliberately determined not to afford Ms. Dudley access to those critical graphics: ODR told Ms. Dudley after she had paid her tuition and was enrolled in the course that it had decided not to create accessible versions of the images.

47.     Miami also failed to hire and train enough human assistants to prepare timely lecture notes, PowerPoint slides, and tactile graphics for Organic Chemistry.  Within the first two weeks of class, Ms. Dudley realized that materials needed for class were not being prepared in a timely manner and promptly notified ODR.  One of Ms. Dudley's assistants reinforced this message, notifying ODR that at least two more assistants were needed for Organic Chemistry.

48.     Miami's failure to provide necessary auxiliary aids and services was apparent to the faculty as well.  The omissions grew so glaring that in April, Dr. Novak, Professor and General Chemistry Coordinator, described Miami's performance:

> I do not believe the current reliance on undergraduate student help will continue to work for [blind] students. It is not working for Aleeha. There have been delays in getting useable graphics and other materials to her, the delay on the mid-term that I mentioned, and constant problems with the size of graphics. Your department needs to hire a full time person (with at least a MS in a science or engineering field) whose job it is to produce usable materials for these students. The undergraduates work inconsistently and in an un-coordinated fashion. If we are going to encourage blind science and engineering students to attend Miami, we need to provide them with adequate resources. My experience with Aleeha in general

chemistry and organic lab over the last two years indicates that we
are not doing the job properly.

49.     Ms. Dudley continued her efforts to persuade Miami to provide her with equal
access, but consistently was met with indifference and no change.  As a result of Miami's use of
inaccessible learning management software and failure to provide a Braille textbook, timely
tactile graphics, and an adequate number of trained human assistants, Ms. Dudley's academic
performance in the first semester of Organic Chemistry reflected the gratuitous barriers she
faced, not her capacity: a C+ in the lecture component of Organic Chemistry and a B in the
Organic Chemistry Laboratory first semester.

50.     The problems in Organic Chemistry increased during the second semester.
Because Miami failed to provide her with timely educational content, she fell two examinations
behind and was forced to withdraw from the Organic Chemistry lecture.  Although Ms. Dudley
maintained her enrollment in the laboratory component, her grade suffered, and she received a C
for second semester.

**B.     Cell Biology**

51.     As was the case with Organic Chemistry, Miami requested, by letter from ODR to
her professor, only that Ms. Dudley receive all class materials in an "alternate format"
compatible with JAWS.

52.     Miami again provided Ms. Dudley with an unremediated and unnavigable
scanned version of the Cell Biology textbook.  Miami completely failed to provide Ms. Dudley
with the tactile reproductions of the accompanying images in the textbook—critical information
to be mastered and learned.

53.     Because the images used in lecture were too complex and detailed to be
represented by a hand-drawn graphic using a tactile drawing kit, the tactile graphics prepared by

Ms. Dudley's assistants during class were unusable. Moreover, because the assistant did not see the images until they had been displayed in class, the images were not produced in time to be useful to Ms. Dudley. Miami once again failed to hire and train enough assistants to prepare accessible versions of lecture notes, PowerPoint slides, and tactile graphics for Cell Biology course material. One of Ms. Dudley's assistants advised ODR within the first two weeks of the semester that Ms. Dudley required at least two more assistants for Cell Biology.

54. Ms. Dudley energetically and repeatedly notified Miami, through ODR, that she was being denied an equal opportunity to access the Cell Biology class, but these efforts yielded nothing. Miami's failure to provide a Braille textbook, effective tactile graphics, and an adequate number of trained human assistants caused Ms. Dudley's grades not to reflect her aptitude, ability to acquire and display her knowledge, or her work habits. As a result of Miami's failures to provide her with an equal opportunity to compete, she received a C- in Cell Biology.

### C. Spanish—Grammar Review & Introduction to Composition

55. Once again, Miami requested by letter from ODR that Ms. Dudley receive all class materials timely in an "alternate format" compatible with JAWS. Nonetheless, in her Spanish class, SPN 311, where handouts were given in class and Power Point slides were displayed, Ms. Dudley did not receive these materials before or in class in an accessible format. Consequently, she was forced to learn the language entirely by listening, while her classmates could learn by both listening and reading. Not given an equal opportunity to compete, Ms. Dudley fell behind her sighted classmates. Although Ms. Dudley e-mailed her professor and notified ODR about the importance of receiving lecture materials in accessible format for use in the classroom, she did not consistently receive these materials in a timely manner.

56.     As a result of Miami's failure to provide timely course materials and a properly trained human assistant, Ms. Dudley underperformed and received a B- in SPN 311.

**D.     Fundamentals of Ecology**

57.     Miami again requested by letter from ODR that Ms. Dudley receive course materials for Fundamentals of Ecology in an "alternate format" compatible with JAWS, so as to provide her with equal access to those materials.

58.     Rather than assigning a textbook for the course, the professor provided a combination of journal articles, book excerpts, and his own work to use as the course text.

59.     The professor posted the course readings as image PDF files on Miami's Niikha portal, a Sakai-based learning management software program. Students were required to log in and download the materials on their own.

60.     Because Niikha is not fully accessible, Ms. Dudley could not access all of its features. But even if she could have secured independent access to the assigned readings, it would have been a fruitless effort, as image PDFs, the format in which the readings were provided, are inaccessible. Image PDFs can be remediated, but no one at Miami did so to ensure that Ms. Dudley was provided the materials in a timely manner. Ms. Dudley also did not receive tactile reproductions of all of the accompanying images in the readings.

61.     The professor also distributed assignments using Google Drive, which was and at this time remains entirely inaccessible to any blind person not owning a Chromebook, to the point that a blind user does not even know when there is content to view. Ms. Dudley did not receive accessible assignments at the same time they were posted using Google Drive and thus did not have timely notice of them or access to them.

62.     The professor also used Turnitin, the same inaccessible software program used to collect assignments in College Chemistry.  Once again, Ms. Dudley could not access the program independently and required a human assistant to submit assignments for her.

63.     The tactile graphics prepared by Ms. Dudley's assistants during class to represent images that appeared in lecture material were untimely and unusable.

64.     Ms. Dudley repeatedly and energetically brought these barriers to Miami's attention through frequent calls, emails and visits to ODR, but Miami again failed to take any corrective steps.

65.     As a result of Miami's use of inaccessible learning management software and its failure to provide timely course materials and effective tactile graphics, Ms. Dudley suffered significant setbacks and necessarily fell behind her classmates.  She was forced to withdraw from Fundamentals of Ecology and take a "W" on her transcript.

**E.     Pre-Calculus**

66.     Miami recognized once again, by letter from ODR to Ms. Dudley's Pre-Calculus professor, that for Ms. Dudley to receive an equal opportunity to access course materials, she would need all course materials in an "alternate format" compatible with JAWS.  For pre-calculus, this meant that digital materials using mathematical notation be presented in MathML and that graphs be tactile.  Many graphs used for pre-calculus are available online, often for free, formatted for embossing as tactile graphs.  In addition, there are a number of pre-calculus texts, complete with tactile graphs, available for order from institutions like the National Braille Press. Blind students at numerous other post-secondary institutions are able to access the same digital math material as their peers at the same time as their peers and with the same ease of use.  Not so at Miami.

67.     Despite the availability of accessible software, Miami uses inaccessible WebAssign to manage homework assignments for Pre-Calculus.  This program allows instructors to create assignments online and transmit them to their students electronically. Students are required to enter their answers online, and the program grades the assignment.

68.     Miami's WebAssign portal is not fully accessible to screen reader software.  Ms. Dudley's screen reader could not read the graphs in the questions because they were unlabeled and contained limited and inadequate alternative text that failed to accurately describe the content of the image.  Ms. Dudley's assistant had to draw graphs and other images by hand on a tactile drawing kit.  It took Ms. Dudley on average three times longer than her sighted peers to complete the assignments.  There is nothing in the nature of the content of the course or digital mathematical content that causes these difficulties.  Rather, the barriers to accessibility encountered by Ms. Dudley were entirely caused by Miami's deliberate decisions to make technology procurement decisions with indifference to the accessibility of the technology in question.

69.     Within the first week of the course and on a regular basis thereafter, Ms. Dudley notified Miami about the myriad of inaccessible features of WebAssign.  Ms. Dudley even made direct contact with employees of WebAssign to find fixes, but these attempts did not resolve the accessibility issues.

70.     Entirely as a result of Miami's use of inaccessible educational tools and failure to provide effective tactile graphics, Ms. Dudley necessarily fell behind her classmates, and her performance suffered.  She received a B- in Precalculus, a grade that by no means reflects her aptitude or work habits, but only that she was denied the equal educational opportunities offered her nondisabled peers at Miami.

**IV.     Fall Semester 2013**

71.     In the first semester of her third year, Ms. Dudley enrolled in BIO 342 Genetics, STA 261 Statistics, KNH 150 Beginning Horseback Riding, MUS 100N Steel Drums, and MUS 185 Diverse Worlds of Music.

> **A.     Genetics**

72.     As had been the case in the preceding semesters, Miami acknowledged, by letter from ODR to her professor, that Ms. Dudley should be provided all class materials in an "alternate format" compatible with JAWS, and that "any images, videos, etc" be available in accessible format.

73.     Nonetheless, Miami provided Ms. Dudley with an unremediated and unnavigable scanned version of the textbook for Genetics.  In addition, Ms. Dudley did not receive tactile reproductions of the accompanying images in the textbook.

74.     The tactile graphics prepared by Ms. Dudley's assistants during class to represent images that appear in lecture material often were illegible to Ms. Dudley and unusable. Consequently, she fell behind her classmates.

75.     Miami again failed to hire assistants in sufficient number and to train the assistants it did hire in how to prepare lecture notes, PowerPoint slides, and tactile graphics in a timely manner before class sessions.  Indeed, it was not until two weeks into the semester that Ms. Dudley had an in-class assistant at all.  While that assistant had previously taken the course, he recalled nothing about it and received no training.  In addition, Ms. Dudley's assistant outside of class, a graduate student who was responsible for preparing the majority of her materials, resigned from her position mid-semester, while informing Miami that its failure to train additional assistants during the summer, as she had requested, made the work too burdensome.

76.     Apparently recognizing that the current process of creating tactile graphics was not working, ODR and the Genetics professor decided to further simplify genetics images to provide accessible copies to Ms. Dudley.  But because they lack the specialized training and knowledge regarding how to translate the information conveyed visually in the graphic into a manner where it can be read by the reader's fingertips, the result was oversimplification that denied Ms. Dudley access to valuable information that was provided to her peers.

77.     The Genetics professor, far from providing accessible materials, distributed tables and charts prepared using inaccessible Google proprietary software called Sheets.  Had these materials either been prepared in Microsoft Excel or converted to Excel, Ms. Dudley and all of her classmates would have had simultaneous and full access to the contents of those charts and tables.  Instead, Ms. Dudley never received the materials at all, completely denying her access to the information provided to her classmates.

78.     Ms. Dudley energetically and repeatedly raised these issues with Miami through frequent calls, emails and visits to ODR, but to no avail.

79.     As a result of Miami's use of inaccessible educational tools and failure to provide a Braille textbook, effective tactile graphics, and an adequate number of trained human assistants, Ms. Dudley necessarily underperformed.  She received a C-, which in no way reflects her efforts or capabilities.

**B.     Statistics**

80.     Miami once again acknowledged by letter from ODR that Ms. Dudley should be provided all class materials in an "alternate format" compatible with JAWS, as well as "any images, videos, etc" in accessible format.

81.     For the first time in three years, Ms. Dudley was given a Braille textbook – a 2008 edition of the course textbook, purchased from the Robert Johnson Braille Accessible Center, that does not correspond in all respects to the edition used by her classmates.

82.     The tactile graphics prepared by Ms. Dudley's assistant during class to represent images that appear in lecture material were frequently illegible to Ms. Dudley and unusable.

83.     Miami used MyStatLab to manage homework assignments in Statistics. The online software program requires students to register on the product website and log in to complete assigned homework problems.

84.     MyStatLab is a Flash-based product and is not fully accessible to screen reader software.  Ms. Dudley's screen reader could not navigate through all the menus and buttons on the website.  Questions and answers are imbedded Flash content and thus were often completely unavailable to Ms. Dudley.  On the occasions when she could view them, they were typically accompanied by graphs, tables and formulas, none of which contained alternative text, making them completely inaccessible to a text-to-speech user.  As a result, she could not complete the assignments on time.

85.     Before the course began, Miami knew that MyStatLab was not accessible with screen reader software and met with Pearson, the program's developer.  Despite the absence of a fix, Miami persisted in using the software for Ms. Dudley's class.

86.     Within the first week of the class, Ms. Dudley confirmed to Miami that MyStatLab remained inaccessible and that she could not access her assigned problems.  Miami responded by offering Ms. Dudley more assistants to work with her outside of class to complete the assignments.  Having a human reader convey statistical information and pose questions is a distinctly inferior way to learn and problem solve for either a Braille reader or a nondisabled

person. Consequently, Ms. Dudley was forced to spend much more time than her sighted classmates to complete the assignments in a way that not only involved inferior learning methods, but also required complicated scheduling and undermined her independence.

87.     In addition, the instructor distributed through Miami's Niikha portal an assignment involving regression analysis and required students to use StatCrunch statistical software to complete it. Because the instructor failed to send the assignment to Ms. Dudley by alternate means in an accessible format, as he was instructed to do, Ms. Dudley did not have timely notice of it.  Furthermore, StatCrunch is also inaccessible, and Ms. Dudley was not taught how to perform regression analysis on Microsoft Excel.  Rather than provide Ms. Dudley equal access to the content, the instructor excused her from the assignment altogether, leaving Ms. Dudley unable to learn the new material and unprepared for the exam.

88.     As a result of Miami's use of inaccessible educational tools and ODR's failure to provide effective tactile graphics, Ms. Dudley has necessarily fallen behind her classmates and her performance has suffered.  She received a D in the course, a grade that does not reflect her aptitude or capability, but once again reflects only Miami's failure to timely and appropriately provide necessary auxiliary aids and services to ensure that Ms. Dudley received an equal opportunity to access course materials.

### C.  Music

87.     Ms. Dudley is an accomplished musician.  However, the excessive time commitments occasioned by the need to work around, overcome and confront the numerous accessibility barriers she encountered at every turn, the stress, strain, discouragement and humiliation occasioned by the discrimination she faced in other classes left her with insufficient time and energy to perform well in her Music class, resulting in a grade of C.

### V.     Spring Semester 2014 and Beyond

89.     Ms. Dudley has already initiated a dialogue with ODR about making structural changes to ensure Miami provides necessary auxiliary aids and services moving forward. Nevertheless, as further evidence of the intractability of the issues at Miami, ODR used Google Calendar to send Ms. Dudley inaccessible meeting invitations to discuss future courses, even after Ms. Dudley's counsel advised Miami about the inaccessibility of Google Apps, and even after sharing an e-mail from the Provost of the University of Michigan warning its faculty, staff and students to refrain from use of Google Apps because of their inaccessibility.

90.     Although Miami has made some efforts to provide Ms. Dudley access to course materials for the upcoming semester and beyond, Miami has not yet confirmed that it will make several critical changes to ensure that Ms. Dudley receives an equal opportunity to access all educational benefits.  Specifically:

91.     Miami has assured Ms. Dudley that it will provide Braille textbooks with accompanying tactile images for all courses in the future.  However, several of the graphics Ms. Dudley has already received for the upcoming semester lack proper sizing and clarity.  Miami has not confirmed that it will provide effective replacements where the graphics are illegible and unusable.

92.     Miami has told Ms. Dudley that she will receive most lecture images and other materials that do not appear in the textbook, including but not limited to PowerPoint slides, in accessible format at least 48 hours prior to the beginning of each class.  However, Miami has not confirmed that it will provide those materials for Ms. Dudley's upcoming Calculus course in advance of all class sessions.  Miami also has not confirmed that the materials will include all of

the same information provided to her peers, including alternative text in place of images on PowerPoint slides so Ms. Dudley may identify and reference the accompanying tactile graphic.

93.     Miami has informed Ms. Dudley that her upcoming Calculus course will continue to use WebAssign, an inaccessible Internet-based application, to distribute and collect coursework.  To this point, Miami has offered no alternative to ensure that Ms. Dudley will receive her Calculus coursework and feedback at the same time and with the same opportunities provided to her sighted peers. Instead of procuring an alternative application, Miami has asked Ms. Dudley to assist the faculty and software consultants in developing a work-around solution. While open communication between Ms. Dudley and Miami's faculty and staff is essential, it is not Ms. Dudley's responsibility to design a technical solution, nor does she have the expertise to do so.  Without confirmation from Miami that it will provide Ms. Dudley with the same content and the same opportunities at the same time as it provides them to other students, Miami will continue to deny her equal access to important course materials and content.

94.     In addition to course software, Ms. Dudley has informed Miami that at least two essential functions of BannerWeb, Miami's online student services portal, are completely inaccessible to screen reader software and thus unavailable to her.  BannerWeb allows students to add and register for courses using a searchable catalog.  Although Ms. Dudley is able to perform a course search using keywords and search variables, several essential features of the results page are inaccessible to her screen reader.  For example, a screen reader cannot access the hyperlinks that report the course registration number, the course description, and the list of required books.  Accordingly, Ms. Dudley is unable to register for courses using the same online system used by her classmates.  BannerWeb also allows students to submit a request for a degree audit, which displays course credits and outstanding requirements, using the Degree Audit

Reporting System ("DARS").  Although Ms. Dudley is able to submit a request for an audit, the resulting report displays color-coded images to show outstanding requirements, which are inaccessible to the blind.  In addition, Ms. Dudley's screen reader cannot access the links that display more information on DARS, including course suggestions to satisfy the unmet requirements.  Accordingly, Ms. Dudley is unable to access not only the same degree audit system used by her peers, but also the essential information it conveys.  Miami has not confirmed that it will make these applications accessible to allow Ms. Dudley to access these services in an equally efficient and equally integrated manner.

## VI.    Miami's Deliberate Indifference to Equal Educational Opportunity

95.    As technology and digital content has permeated post-secondary education, there has been an extraordinary opportunity for students with print disabilities to have equal and mainstream access to the same content at the same time as everyone else.  Unfortunately, at some campuses, like Miami, the failure to insist on accessible technology and content, and the failure of leadership to require faculty to provide accessible copies of assignments, graphics that will be displayed in class, and class notes has resulted in greater inequality of access than existed when everything was printed on paper.  This failure then requires vastly inferior alternate auxiliary aids and services, such as assistants/scribes/readers who, under the best of circumstances, produce less effective communications and who, more often, are insufficiently trained and insufficiently available.

96.    Through a combination of assiduous advocacy, education and litigation, disability rights groups and state and federal agencies have attempted to focus the attention of post-secondary education on meeting the legal and moral imperatives raised by these developments.

The Departments of Justice and Education wrote the presidents of all American post-secondary institutions in June 2010 to advise them that

> Requiring use of an emerging technology in a classroom environment when the technology is inaccessible to an entire population of individuals with disabilities- individuals with visual disabilities- is discrimination prohibited by the Americans with Disabilities Act of 1990 (ADA) and Section 504 of the Rehabilitation Act of 1973 (Section 504) unless those individuals are provided accommodations or modifications that permit them to receive all the educational benefits provided by the technology in an equally effective and equally integrated manner.

Unfortunately, since that letter, Miami has expanded to every aspect of education its use of emerging technology that is inaccessible to an entire population of individuals with a disability, who, like Ms. Dudley, cannot see, and without providing her the auxiliary aids and services that would permit her to receive **all** the educational benefits provided by the technology, much less in an equally effective and equally integrated manner.

97.     To ensure that Miami understood its obligations and the path to carrying them out, the General Counsel for the University System of Ohio, Sloan Spalding, on behalf of the Board of Regents of the University System, wrote Miami and its sister Ohio colleges in November 2011 as follows:

> Each of our University System of Ohio institutions is subject to the nondiscrimination requirements of Section 504 of the Rehabilitation Act and the ADA. Thus, **vigilant compliance programs must be in place to review and monitor, on an ongoing basis,** all websites established by schools and **the various educational aids used at each school**. It also is important to **monitor online** or web-based learning **content** created and **used by our faculty** to ensure full accessibility. Additionally, **online programs that are provided by the school through a contractual or other arrangement also are under the obligation to make modifications to avoid disability-based discrimination.**
>
> Please consider directing your accessibility compliance staff to use the enclosed document to aid in their audit of your school's use of

> existing and emerging electronic technology and learning aids.
> Hopefully, an audit will verify your efforts in complying with
> these federal requirements and further enrich the learning
> opportunities of all your students.

98.     Despite this admonition, on information and belief, Miami has taken no action to

identify and replace inaccessible technology and digital content with accessible technology and

content.

99.     This deliberate inattention to accessible technology pervades the campus beyond

the classroom.  As mentioned earlier, essential functions of BannerWeb are completely

inaccessible to Ms. Dudley.  In addition, until this semester, course offerings for early

registration were available only in an inaccessible image PDF format. Ms. Dudley lived in

University housing for her first two years on campus.  During that time, she encountered

exclusively touchscreen laundry machines, which, unlike standard laundry machines are

inaccessible to the blind, depriving Ms. Dudley of doing even this basic activity independently.

The 24-hour dining option also operated through the use of an inaccessible touchscreen.  While

the regular dining hall closed at 7:00 pm, "The Scoreboard Market" allowed only sighted

students to get hot food day and night by using a touchscreen to order, forcing Ms. Dudley to be

gratuitously dependent.

**VII.    Impact of Discrimination on Ms. Dudley**

100.     Ms. Dudley's experiences have been humiliating and demoralizing.  Ms. Dudley

has not been given an equal and independent opportunity to learn.  The grades she received do

not accurately reflect her knowledge and skill, but instead reflect only the discrimination she has

suffered.

101.     Since the fall of 2011, Ms. Dudley has worked tirelessly to pass the courses

required to successfully complete a degree in zoology.  Although she has taken elective courses

and fulfilled some general education credits, she still must satisfy her organic chemistry requirement and take at least 30 more hours of upper level zoology courses, even though she has completed five semesters.  Moreover, many courses must be taken in sequential order, and some are only offered once a year.  As a result of the barriers Miami has forced her to encounter, her graduation date will be delayed by at least two semesters.

102.    In addition, Ms. Dudley's poor grades have at least jeopardized, if not destroyed, her chances of getting admitted to veterinary school after graduation.  Many grades from her first two years are below average and her grade point average is currently at 2.64.  As a result, the likelihood that she can secure admission to veterinary school, in the absence of equitable relief, verges on zero.  This did not need to be if Miami had done what it had promised and what, at all events, it was obligated to do.

103.    Ms. Dudley is emotionally exhausted, depressed and anxious from her battle with Miami for the right to an equal opportunity to learn.

104.    Ms. Dudley has continued to pay tuition for an inferior educational experience while Miami has failed to uphold its obligations.  Miami has breached its promise to Ms. Dudley, namely, to provide her both "the opportunities of a major university" and "the personalized attention found in the best small colleges," as stated in its mission statement.  Miami has failed to train her in an equally effective manner and prepare her to enter the job market alongside her sighted classmates.

### COUNT I
### Violations of Title II of the Americans with Disabilities Act
### 42 U.S.C. § 12131 *et seq.*
### (Against Defendant Hodge, in his official capacity)

105.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs, as if alleged herein.

106. The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, guarantees equal access for qualified individuals to the benefits of the services, programs or activities of a public entity. 42 U.S.C. § 12132 *et seq.*

107. Title II of the ADA mandates, *inter alia*, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

108. Furthermore, such public entities "shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1).

109. Miami, as a state-chartered and directed school, is a public entity under Title II of the ADA.

110. Classes and facilities at Miami are services, programs or activities provided by the University.

111. Ms. Dudley is an individual with a disability under the ADA.

112. Ms. Dudley was admitted based on all general requirements to be a student at Miami and thus is a qualified individual entitled to the protections of the ADA.

113. Miami has failed and is failing to meet its obligations to provide blind students with educational opportunities that are equal to those provided to students without disabilities. Miami has excluded Ms. Dudley from participation in, denied her the benefits of, or otherwise discriminated against her in its facilities, services, programs or activities.

114.     Miami's actions constitute intentional discrimination on the basis of a disability in violation of the ADA, in that Miami: (1) has failed to maintain policies and procedures to ensure compliance with Title II, specifically policies that provide equal access and effective communication to individuals with disabilities; (2) has failed to ensure that communications with Ms. Dudley were as effective as communications with non-disabled peers; (3) has failed to provide auxiliary aids and services or to modify policies and procedures to prevent discrimination; (4) has failed to provide reasonable modifications of policies, practices, and procedures; (5) has purchased and deployed new equipment and software that is inaccessible to Ms. Dudley after the effective date of the ADA; (6) has failed to provide educational opportunities and educational information in a manner that is timely, equally effective and equally integrated; and (7) has otherwise discriminated against Ms. Dudley.

115.     As a result of Miami's actions, Ms. Dudley has suffered and continues to suffer irreparable harm: she has suffered and continues to suffer from discrimination and unequal access to Miami's programs and activities, and will not be graduated and enter the job market on-time, if at all, and with the credentials she could have earned had she been given an equal opportunity.  She has been and continues to be denied full access to the knowledge intended to be communicated in her classes.

116.     The actions by Miami were done intentionally or with deliberate indifference to the protected rights of Ms. Dudley.

## COUNT II
## Violations of § 504 of the Rehabilitation Act of 1973
## 29 U.S.C. § 794 *et seq.*
## (Against Defendant Miami University)

117.     Plaintiff incorporates by reference all allegations contained in the preceding paragraphs, as if alleged herein.

118.    Section 504 of the Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

119.    Section 504 defines "program or activity," in pertinent part, as "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government . . . ." 29 U.S.C. § 794(b)(1).

120.    Such federally funded programs and activities must provide aids and services that "afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs."  45 C.F.R. § 84.4(b)(2).

121.    Miami receives federal grants, contracts, and other financial assistance, thereby subjecting itself to the requirements of Section 504.

122.    Ms. Dudley is blind and was admitted based on all general requirements to be a student at Miami.  She is therefore a qualified individual with a disability under Section 504.

123.    Miami has, solely by reason of her disability, excluded Ms. Dudley from participation in, denied her the benefits of, and otherwise discriminated against her in its facilities, services, programs or activities.  Miami's violation of Section 504 and its regulations has denied and continues to deny Ms. Dudley an equal opportunity to access the educational benefits Miami offers as a public university.

124. Miami's actions constitute intentional discrimination on the basis of a disability in violation of the Section, in that Miami: (1) has failed to maintain policies and procedures to ensure compliance with Section 504, specifically policies that provide equal access and effective communication to individuals with disabilities; (2) has failed to ensure that communications with Ms. Dudley were as effective as communications with non-disabled students; (3) has failed to provide auxiliary aids and services or to modify policies and procedures to prevent discrimination; (4) has failed to provide reasonable modifications of policies, practices, and procedures; (5) has purchased and deployed new equipment and software that is inaccessible to Ms. Dudley after the effective date of Section 504; (6) has failed to provide educational opportunities and educational information in a manner that is timely, equally effective and equally integrated; and (7) has otherwise discriminated against Ms. Dudley.

125. As a result of the Miami's actions, Ms. Dudley has suffered irreparable harm: she has suffered and continues to suffer from discrimination and unequal access to Miami's programs and activities, and likely will not be graduated and enter the job market on-time, nor with the credentials she might have earned had she been granted an equal opportunity. Furthermore, as a result of Miami's actions, Ms. Dudley's grades do not accurately reflect her knowledge and skills, and she has been and continues to be denied full access to the knowledge intended to be communicated in her classes.

126. The actions by Miami were done intentionally or with deliberate indifference to the protected rights of Ms. Dudley.

**CLAIMS FOR RELIEF**

127. WHEREFORE, Plaintiff Ms. Dudley demands judgment against the Defendants as follows:

(a)  A preliminary and permanent injunction (1) prohibiting Defendants from violating Title II of the ADA and the Rehabilitation Act; (2) permitting Ms. Dudley to have her grade expunged in any of the classes specifically described in this complaint; and (3) requiring Defendants to pay tuition and costs for Ms. Dudley to repeat her first three undergraduate years;

(b)  A declaration that Defendants have and continue to violate Title II of the ADA and the Rehabilitation Act;

(c)  Awarding Plaintiff compensatory damages;

(d)  Awarding Plaintiff her reasonable attorneys' fees and costs; and

(e)  Awarding such other and further relief as the Court may deem just.

January 10, 2014

Respectfully submitted,

s/Kerstin Sjoberg-Witt
Kerstin Sjoberg-Witt (0076405), Trial Attorney
ksjoberg-witt@disabilityrightsohio.org
Laura Osseck (0082231)
losseck@disabilityrightsohio.org
Ohio Disability Rights Law and Policy Center, Inc.
Disability Rights Ohio
50 W. Broad Street, Suite 1400
Columbus, Ohio  43215-5923
Telephone:  (614) 466-7264
Facsimile:   (614) 644-1888
*Counsel for Plaintiff*

Of Counsel:

Daniel F. Goldstein
Sharon Krevor-Weisbaum
Emily L. Levenson
Brett D. Watson
BROWN, GOLDSTEIN & LEVY LLP

120 E. Baltimore Street Suite 1700
Baltimore, Maryland 21202
Phone: (410) 962-1030
dfg@browngold.com
skw@browngold.com
elevenson@browngold.com
bwatson@browngold.com