```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
 2                        WESTERN DIVISION
                              - - -
 3
     ALEEHA DUDLEY,                 :
 4                                  :  CIVIL NO. 1:14-CV-38
               Plaintiff,           :
 5       -vs-                       :  Motion Hearing by Telephone
                                    :
 6   MIAMI UNIVERSITY, et al.,      :  Wednesday, December 14, 2016
                                    :  1:38 p.m.
 7               Defendants.        :  Cincinnati, Ohio

 8                            - - -
                    TRANSCRIPT OF PROCEEDINGS
 9         BEFORE THE HONORABLE SUSAN J. DLOTT, JUDGE
                              - - -
10
     For the Plaintiff:   Daniel F. Goldstein, Esq.
11                        Emily L. Levenson, Esq.
                          Sharon Krevor-Weisbaum, Esq.
12                        Brown, Goldstein & Levy, LLP
                          120 East Baltimore Street, Suite 1700
13                        Baltimore, Maryland  21202

14                        Kerstin Sjoberg-Witt, Esq.
                          Disability Rights Ohio
15                        50 West Broad Street, Suite 1400
                          Columbus, Ohio  43215
16
     For the Defendant:   Daniel J. Buckley, Esq.
17                        Erin D. French, Esq.
                          Vorys, Sater, Seymour & Pease
18                        301 East Fourth Street, Suite 3500
                          Cincinnati, Ohio  45202
19
                          Elizabeth Thym Smith, Esq.
20                        Vorys, Sater, Seymour & Pease
                          52 East Gay Street
21                        Columbus, Ohio  43216

22   For the United States of America:

23                        Pearline M. Hong, Esq.
                          Nabina Sinha, Esq.
24                        U.S. Department of Justice
                          950 Pennsylvania Avenue, N.W. - NYA
25                        Washington, D.C. 20530
```

Proceedings recorded in stenotype.
Transcript produced using computer-aided transcription.

```
 1                           Matthew J. Horwitz, Esq.
                             Assistant United States Attorney
 2                           221 East Fourth Street, Suite 400
                             Cincinnati, Ohio  45202
 3

 4     Also Present:         Mitchell McCrate

 5


 6


 7     Law Clerk:            Jennifer Johnson

 8     Administrative
       Assistant:            Vicki Penley
 9
       Court Reporter:       Julie A. Wolfer, RDR, CRR
10                           100 East Fifth Street
                             Cincinnati, Ohio  45202
11

12                                - - -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>PROCEEDINGS</u>

1

2          (1:38 p.m.)

3               MS. PENLEY:  I'll start over.  Thanks so much for

4     calling back.

5               We're here this afternoon on a conference call in Case

6     Number 1:14CV38, <u>Aleeha Dudley versus Miami University</u>.

7               I'm just going to read the names that I have, and if I

8     miss your name, then you can please tell me at the end.

9               For plaintiff, Miss Dudley, I have Kerstin

10    Sjoberg-Witt.  Correct?

11              MS. SJOBERG-WITT:  Yes.  Yes, that's correct.

12              MS. PENLEY:  For the United States, I have Nabina

13    Sinha.  Correct?

14              MS. SINHA:  Correct.

15              MS. PENLEY:  Pearline Hong.  Correct?

16              MS. HONG:  Correct.

17              MS. PENLEY:  Matthew Horwitz.  Correct?

18              MR. HORWITZ:  Correct.  Correct.

19              MS. PENLEY:  For Miami University, I have Elizabeth

20    Smith?

21              MS. SMITH:  Yes.

22              MS. PENLEY:  Erin French?

23              MS. FRENCH:  Correct.

24              MS. PENLEY:  Dan Buckley?

25              MR. BUCKLEY:  Yes.

1          MS. PENLEY:  And I also have Mitchell McCrate as

2    deputy general counsel.

3          MR. MCCRATE:  That's correct.

4          MS. PENLEY:  Okay.  For plaintiff, did I miss anyone's

5    name?

6          MR. GOLDSTEIN:  You did for plaintiff.

7          MS. PENLEY:  Okay.  What's your name?

8          MR. GOLDSTEIN:  My name is Daniel Goldstein.

9          MS. PENLEY:  Okay.

10         MR. GOLDSTEIN:  And with me is Sharon Krevor-Weisbaum

11   and Emily Levenson.  All of our appearances are entered.

12         MS. PENLEY:  Sharon and Emily.  Correct?

13         MR. GOLDSTEIN:  Correct.

14         MS. PENLEY:  Okay.  Did I leave anyone else out?

15      (No response.)

16         MS. PENLEY:  Okay.  I should have Kerstin

17   Sjoberg-Witt, Daniel Goldstein, Emily Levenson, Sharon

18   Krevor-Weisbaum, Nabina Sinha, Pearline Hong, Matthew Horwitz,

19   Elizabeth Smith, Erin French, Dan Buckley, and Mitchell

20   McCrate.  Correct?

21         MR. BUCKLEY:  Yes.

22         UNIDENTIFIED SPEAKER:  Yes.

23         MS. PENLEY:  Here in chambers is Judge Susan Dlott,

24   law clerk Jennifer Johnson, court reporter Julie Wolfer.

25         If you could state your name, please, before you

```
 1   speak.

 2             THE COURT:  I want you to go make a seating --

 3             MS. PENLEY:  Okay.

 4             THE COURT:  If you'll all just wait one moment, I want

 5   to have Vicki make a copy of the seating chart.

 6             And I, while we're waiting for that, first of all, I

 7   want to apologize for this taking so long for us to get to this

 8   consent decree.  Unfortunately, I had a very severe illness

 9   that arose suddenly about eight weeks ago, and I've been out.

10   This is my first day back, and so we wanted to get to this as

11   soon as possible.

12             And I want to thank my law clerk Jennifer Johnson for

13   doing so much work on this in the meantime.

14             I also want to clarify one thing with all of you, and

15   that is that the document number 62 that was put on on it looks

16   like August -- it's dated August 19th at the bottom but it says

17   August 22nd where the document number is, that was an entry of

18   dismissal with prejudice, and it was not the best wording in

19   the world and the docket entry which reflects that on the

20   docket sheet is incorrect; and we're going to go ahead and

21   correct that because all that was dismissed at the time, as I

22   understand it, was Aleeha Dudley's claims against Miami

23   University and Dr. David Hodge.  The Court retained

24   jurisdiction and the case was still pending of United States of

25   America versus Miami University.
```

1          Now, if I've got any of that incorrect, let me know

2     now and we'll fix that as well.  Any comments on that?

3          MR. GOLDSTEIN:  None from Miss Dudley's counsel, Your

4     Honor.

5          THE COURT:  Okay.  All right.  Well, then, next --

6          MR. BUCKLEY:  Judge?

7          THE COURT:  Yes.

8          MR. BUCKLEY:  Judge, this is Dan Buckley.  I think

9     there might be an underlying question of either subject matter

10    jurisdiction or whether the case states a claim because there's

11    still this lurking question of whether the DOJ can assert a

12    Title II claim.

13         There's some recent case law -- and by saying all

14    this, Miami is not at all repudiating its agreement and its

15    commitment to settle the case.  I am just, as an officer of the

16    court, saying to the Court there may be an underlying question

17    of subject matter jurisdiction that the Court may want us to

18    brief simultaneously or quickly or shortly before we go ahead

19    and proceed with the order.  But I want to emphasize Miami is

20    not at all repudiating its agreement.  It agreed.  It reached

21    the settlement.  I just want to raise this as an officer of the

22    court.

23         THE COURT:  Okay.

24         MS. HONG:  Your Honor, this is Pearline Hong for the

25    United States.  Mr. Buckley has framed this as a question of

1    subject matter jurisdiction.  But as we informed him earlier

2    this morning, the Supreme Court and Sixth Circuit have

3    unequivocally held that this is not a jurisdictional issue.

4    And even if it were a jurisdictional issue, Your Honor, as an

5    intervenor, the Sixth Circuit has been clear that the United

6    States need not have independent standing in order to bring

7    forward its claims.  This Court already granted the United

8    States' motion to intervene well over a year ago, and at this

9    point Miami has waived any objection for statutory standing,

10   our standing to bring suit under Title II of the ADA.

11            If the United States lacks statutory standing, the

12   Sixth Circuit has held that the proper course is to dismiss for

13   failure to state a claim, and Miami did not file a 12(b)(6)

14   motion in this case and its time to do so has passed.

15            THE COURT:  Okay.

16            MR. BUCKLEY:  Judge?

17            THE COURT:  Yes.

18            MR. BUCKLEY:  Just briefly, I don't want to -- I'm not

19   even angry.  I'm not -- I'm just -- the Sixth Circuit case

20   simply holds that the Title II standing question is one of

21   statutory standing, not jurisdictional standing.  It's a murky

22   distinction that you'll find muddy throughout the law.  And all

23   I am doing, I'm not really fighting, I am really saying because

24   federal courts are courts of limited jurisdiction, before we

25   all go forward with an important document, a consent decree, I

```
 1    want to know about this jurisdictional issue.

 2              MS. HONG:  And so, Your Honor, in Lexmark

 3    International, a 2014 Supreme Court case, the Court said that

 4    this -- the question this case presents is whether the

 5    plaintiff falls within the class of plaintiffs whom Congress

 6    has authorized to sue under the statute.  In other words, we

 7    ask whether the plaintiff has a cause of action under the

 8    statute.

 9              The Court then went on to say that the term "statutory

10    standing" is misleading because, you know, we're not talking

11    about jurisdiction at all.  This is not a jurisdictional issue.

12    The Sixth Circuit has in several cases affirmed that principle.

13              In Roberts v. Hamer, a 2011 decision, the Sixth

14    Circuit said:  "This case concerns statutory standing, an issue

15    we find to be a matter of statutory construction, not

16    jurisdiction."

17              The Court then went on to say that: "Where a plaintiff

18    lacks statutory standing to sue, her claim should be dismissed

19    for failure to state a claim, not for lack of subject matter

20    jurisdiction."

21              THE COURT:  Okay.  Does that satisfy you, Mr. Buckley?

22              MR. BUCKLEY:  I'm not -- I don't -- I'm -- Judge, I'm

23    willing to submit a one-page memo on this or something like

24    that.  I don't want to have an oral argument on the point.  I'm

25    thinking -- I'm doing what I'm doing as I think a good lawyer
```

1  raising this to the Court.  The question of statutory versus

2  subject matter jurisdiction is not all that simple.  "Murky" is

3  the word.  And I thought the Court ought to have an opportunity

4  to consider it before it enters the order.  That's all I'm

5  doing.

6          THE COURT:  Okay.  Let me put you on hold for just a

7  moment.

8      (Off-the-record discussion.)

9          THE COURT:  All right.  Counsel, this what Mr. Buckley

10 has had to say is sort of out of left field for me because my

11 impression was that, you know, we had an agreement.  We were

12 going to go forward with the agreement.  The only thing that

13 the Court was questioning was, frankly, the way some of the

14 terms are identified because I don't want to get this case back

15 quibbling about what was meant in the agreement by certain

16 language.

17         I am satisfied going forward.  If you're not,

18 Mr. Buckley, then I guess we need to do something about that.

19 I don't know if, you know, if you want to insist on filing

20 something, you can, and the U.S. can respond.  It's going to

21 delay this.

22         MR. BUCKLEY:  I don't want to delay it, Judge; you

23 know I don't.

24         THE COURT:  All right.  Then why don't we just go

25 ahead with our comments on the consent decree because I would

```
1    really -- I feel bad that my illness has caused this not to go

2    on sooner, and I would really like to finally get it done for

3    the parties.

4         All right.  Are we ready for comments, then?

5         Let me have Jennifer just go through some of the

6    things -- some of the terms that we felt, you know, that the

7    definitions may not be real clear just because, you know, we

8    want to -- we want to make this agreement as bulletproof as

9    possible for everybody.

10        MS. JOHNSON:  Okay.  Hi, everyone.  Judge asked me to

11   just run through our list.

12        So the overall concern we had was consistency in

13   terms.  Specifically, the language "qualified student with a

14   disability," "qualified individual with a disability," "student

15   with a disability, students with a disability."  We just wanted

16   to make sure that whomever you're talking about the consent

17   decree applying to is clear.  And we thought, you know, we

18   didn't think that was a deliberate thing, we thought maybe it

19   was an oversight, but that you may want to go back through the

20   agreement and make sure that you're using consistent language

21   and you're defining what that means, "qualified student with a

22   disability," or if you want the language to be "a qualified

23   individual with a disability."

24        So I'm going to go ahead and point out in the consent

25   decree where we saw some terms that maybe could use some
```

1    clarification or were inconsistent.

2              Do you want to put them on hold?

3              MS. PENLEY:  Yes.

4              MS. JOHNSON:  One second, please.

5         (Off-the-record discussion.)

6              MS. JOHNSON:  I'm sorry, everyone.  We had an

7    unexpected visitor very briefly.

8              THE COURT:  Judge Barrett dropped in for a quick kiss

9    and four Snickers bars.

10             MS. JOHNSON:  Okay.  So I'll pick up where we left

11   off.

12             So like I was saying, we thought that perhaps one

13   term, one uniform saying, should be used in the places that I'm

14   about to point out and that whatever it is is up to you.  We

15   just wanted to make sure it's clear what that means.

16             MR. GOLDSTEIN:  Judge, this is Dan Goldstein.  If I

17   could interject for just a second.

18             THE COURT:  Sure.  Go ahead.

19             MR. GOLDSTEIN:  I think part of the question was some

20   of these things were for only the students; some refer to staff

21   and other people in the college community, either with or

22   without students; and some such as people who are applicants or

23   otherwise not members of the community, when it's a question of

24   their access, that is a third category.  So I think you may

25   find there's a method to the inconsistency.

12

1          THE COURT:  Which is fine with us if -- that's all we

2     want to know is if there is a method.  If there's a method and,

3     you know, no one's going to have a disagreement later about,

4     you know, what these terms mean in each of the places where

5     they're mentioned, that's fine with us.  We just wanted to

6     point it out and make sure you're aware of it.  But what, you

7     know, what you say makes perfect sense that there was -- there

8     was a reason for all of this, and that's all we wanted to

9     double-check.

10          MS. JOHNSON:  Yeah.  So if there's a method to it,

11     that's fine.

12          One thought might be to -- I don't know if you had

13     considered defining the word "qualified" or "disability."  I

14     don't recall seeing them defined.  But that could be something

15     that's pretty broad and open for interpretation later, and so

16     just food for thought if it hasn't been considered.

17          So I'm going to go ahead and proceed through the

18     comments that we have, and we can address if you have logic to

19     what you're doing, that's fine, but we just wanted to point out

20     things that jumped out to us.

21          So we'll start with page six.  Page six, paragraph 20,

22     line one, this is where we first saw "qualified individuals

23     with disabilities," and we weren't sure if you wanted to define

24     what that means.

25          THE COURT:  And anybody, if you want to -- any

13

1    comments you've got to make, you know, please feel free to

2    interrupt.  Just identify who's speaking when you do.

3         MS. SINHA:  Sure.  This is Nabina Sinha for the United

4    States.  So I'll just quickly address that.

5         So that's language, "qualified individual with a

6    disability" is language that comes from the ADA itself.  So I

7    don't think we considered defining it but assumed that to the

8    extent it needs to be defined, we could relate it back to the

9    statute itself.

10        THE COURT:  Okay.

11        MS. JOHNSON:  Yeah, I figured it came from the

12   statute, but that might be something that's worth putting in

13   the actual document so that we can -- if we're -- if the Court

14   is in the position of having to interpret something that's

15   happening, we can safely rely upon ADA case law, for example,

16   for what that might mean.

17        MS. SINHA:  Understood.  And that's something that the

18   parties can think about.

19        MS. JOHNSON:  Okay.  The next time we noticed that was

20   page seven, paragraph C, and, again, I'm just pointing this

21   out, "qualified student with a disability."

22        Page ten, paragraph C 25, line two, we didn't see

23   where "LMSs" were defined and we weren't sure what that meant.

24   There's some technical terms that we just weren't familiar

25   with, such as "WC3," "WCAG 2.0."

14

```
 1          MR. MCCRATE:  "LMS" is defined on page four, paragraph
 2     12.
 3          MS. JOHNSON:  Okay.
 4          MR. MCCRATE:  That was Mitchell McCrate.  Sorry.
 5          THE COURT:  I'm sorry, who was that?
 6          MR. MCCRATE:  Mitchell McCrate.
 7          THE COURT:  I'm sorry, page four -- oh, there you are.
 8     Paragraph 12?
 9          UNIDENTIFIED SPEAKER:  Yes.
10          MS. JOHNSON:  Okay.  Great.
11          THE COURT:  Great.
12          MS. HONG:  And this is Pearline Hong for the United
13     States.  "W3C" and "WCAG" are defined at page six, paragraph
14     21.
15          MS. JOHNSON:  Okay.  Great.
16          THE COURT:  Good.
17          MS. JOHNSON:  Okay.  And that same paragraph 25 also
18     has the language "student with a disability," which was
19     different, we noticed, than -- because it didn't include the
20     word "qualified."  So we're pointing that out to you.
21          Page 11 similarly uses the language, "students with a
22     disability," in paragraph 28.  And, you know, we weren't sure
23     with the consistency if you wanted to use the term "qualified."
24          Page 18 --
25          THE COURT:  If you want to put on the record as we're
```

1    going along the reasons for this, it might be helpful if we

2    later have a -- have to have a hearing about it.

3         Anybody want to explain why you don't have "qualified"

4    within paragraph 28 there?

5         MS. SINHA:  Yes.  So this is Nabina Sinha for the DOJ.

6    And, again, it's just that we were seeking to not impose the

7    ADA definition.  So "qualified" comes from the ADA and has a

8    particular meaning.  And when we were -- and in the ADA, it's

9    individuals, qualified individuals with disabilities, and we

10   didn't want to import any additional limitation on the

11   definition or the universe of students with disabilities.

12        So we don't think that "qualified" is really necessary

13   when we're talking about students with disabilities.  I do

14   recognize that that's, you know, on the face of it that's a

15   distinction.

16        MS. JOHNSON:  So are you saying that in all instances

17   where you use the word "student," you -- the word "qualified"

18   doesn't need to be in there, or just in this Textbook and

19   Course Material Accessibility it's unnecessary to say

20   "qualified"?

21        MS. SINHA:  That it's unnecessary to say "qualified."

22        MS. JOHNSON:  Okay.  All right.  Page 18, F.32a,

23   again, "qualified individuals with disabilities."  We're just

24   noting the different language there.

25        MS. SINHA:  Yes.  And I think that makes sense with,

1  you know, our method of sort of distinguishing between all

2  individuals with disabilities versus students with disabilities

3  versus other types of categories.

4  　　　　　MS. JOHNSON:  Okay.  Page 22, you had helpfully

5  pointed out that a lot of the acronyms were defined previously.

6  I know "DAISY" was.

7  　　　　　So, let's see, paragraph sub six and sub seven have

8  some acronyms in them, and we just wanted to be sure that they

9  were defined.

10  　　　　　MS. SINHA:  So this is Nabina Sinha from DOJ.  We're

11  flipping through ourselves.  So some of these acronyms are --

12  are technical in nature, and I don't know actually that they

13  are all defined.

14  　　　　　MS. HONG:  This is Pearline Hong for the United

15  States.  "ATAG," "WAI-ARIA," "WCAG2ICT," all of those are

16  defined on page 12.  "MathML" is also there.

17  　　　　　THE COURT:  Okay.

18  　　　　　MS. JOHNSON:  Does that cover all of the acronyms,

19  then?

20  　　　　　MS. HONG:  Yes.  They're all covered on page 12 and

21  then on page -- excuse me for one second -- page six.

22  　　　　　THE COURT:  Okay.

23  　　　　　MS. HONG:  And I believe that covers it.

24  　　　　　MS. JOHNSON:  Okay.  Great.  Thank you.

25  　　　　　And then lastly, page 37, paragraph 64, "qualified

1   individuals with disabilities" is used.

2         MS. SINHA: So this is Nabina Sinha with DOJ. Yeah,

3   and that was an intentional use there.

4         MS. JOHNSON: Okay.

5         THE COURT: Okay.

6         MS. JOHNSON: That's everything, I think.

7         THE COURT: Okay. That's everything we've got.

8         I don't know if anything, you know, that we've raised

9   today makes you want to make any changes in the agreement. It

10   doesn't seem like it does. Correct me if I'm wrong. If not,

11   the Court's willing to go ahead and sign it.

12         MR. BUCKLEY: Judge, this is Dan Buckley again. Do

13   you want to -- do you want to just -- I can get it to you by

14   letter this afternoon, the case law on this jurisdictional as

15   opposed to statutory issue, or do you just -- are you ready to

16   do it? I mean, there's a recent case from the Southern

17   District of Florida. There's some -- I'm not just speaking

18   through my hat.

19         MS. HONG: Your Honor, for --

20         THE COURT: Who's speaking? Wait, wait. Who's

21   speaking?

22         MS. HONG: I apologize. This is Pearline Hong for the

23   United States. For over 50 years, the United States has been

24   enforcing statutes like the ADA, civil rights statutes that are

25   based on Title VI of the Civil Rights Act, and this is the very

18

1   first case, this case from the Southern District of Florida, in

2   which a District Court has ever held that the United States

3   lacks standing to pursue a Title II claim.

4          I think that the Supreme Court and Sixth Circuit case

5   law is very clear that this is not a jurisdictional issue.  And

6   in any event, the unique circumstance of the United States'

7   intervention in this suit as opposed to initiation of a suit on

8   its own means that the United States does not even need to have

9   independent standing, as we argued in our briefing last year.

10          THE COURT:  I would agree with Miss Hong.

11          Mr. Buckley, if you feel compelled to file something,

12   you know, I will hold off doing that.  I think -- I'll hold off

13   signing the consent decree.  I then think then that Miss Hong

14   should put something on the record in response to that.

15          MR. BUCKLEY:  What I'm going to do, Judge, I'll just

16   send you a cite -- a letter --

17          THE COURT:  No, you've got to file.  Whatever you do

18   has got to be of record.

19          MR. BUCKLEY:  I know.  I'm prepared to have this of

20   record.  And I'm -- do you want it in a memorandum form?  Do

21   you want it -- I'm willing to do it in correspondence with a

22   couple of brief citations, and then Miss Hong can launch a

23   17-page rebuttal.  It's recent law.

24          MR. GOLDSTEIN:  Your Honor, this is Mr. Goldstein.  If

25   I may interject because we have an interest in this outcome as

1  well.  Miss Dudley is a party to the agreement.

2          THE COURT:  Right.

3          MR. GOLDSTEIN:  I understood, I thought I understood

4  Mr. Buckley to say that he was only discharging his duty as an

5  officer of the court to make the Court aware, which he has done

6  and done on the record since I understand that this is in a

7  transcript, and it seems to me that that's getting stretched a

8  little bit.

9          But if it's going to be in writing, then if it's not

10 in the context of a motion, I don't know that there's any

11 action for the Court to take.  I think at this point, frankly,

12 Mr. Buckley should either move to dismiss or say, well, I've

13 discharged my duties as an officer of the court.

14         I'm puzzled, frankly, by the "I'm not repudiating this

15 but" --

16         MR. BUCKLEY:  Here's what -- wait a minute.

17         THE COURT:  Wait, wait, wait.  Let him finish.

18         MR. BUCKLEY:  I'm sorry.

19         MR. GOLDSTEIN:  That's all right.  I'll stop there.  I

20 think I've made my point.

21         THE COURT:  No, and I agree with you, Mr. Goldstein.

22 I think the only appropriate way to bring a matter to the

23 Court's attention is in the form of a motion.

24         MR. BUCKLEY:  Okay.  I have raised what I think a

25 lawyer is supposed to do when there is a question of

20

1    jurisdiction.  There's a recent case in the Southern District

2    of Florida.  I am not going to move and extend this and turn it

3    into briefing.  I'm willing to give the citation, if the Court

4    wants it.  If the Court doesn't, I'm done.

5            THE COURT:  No, the Court really doesn't want it.  If

6    it's not going to be in the form of a motion addressed to the

7    Court and responded to by opposing counsel, then I really don't

8    think it's appropriate.

9            MR. BUCKLEY:  Okay.  Thank you.

10           THE COURT:  All right.  So let me ask everybody, then,

11   is it okay to go ahead and sign the consent.

12           Is it okay for the Court to go ahead and sign the

13   consent decree?  Any opposition to that at this point?

14           MS. HONG:  This is Pearline Hong for the United

15   States.  No opposition, Your Honor.

16           MS. SMITH:  This is Elizabeth Smith from Miami

17   University.  No opposition.

18           MR. GOLDSTEIN:  This is Dan Goldstein on behalf of

19   Miss Dudley.  No opposition, Your Honor.

20           THE COURT:  Okay.  Have we got everybody, all the

21   parties?

22           All right.  I will get the decree on today.

23           I want to congratulate all of you for doing an amazing

24   job really on this consent decree.  I know how much work

25   everybody put into this case, and, you know, I think it will

1    benefit a whole lot of other universities in the future.  In

2    fact, the president of Xavier University, I mentioned this to

3    him, and he asked me if I would send him a copy of the decree

4    once it was signed.  So I hope it has a widespread effect.

5              And I want to thank you all for everybody's patience

6    in working through this.

7              Anything further?

8              MR. GOLDSTEIN:  Yes, Judge, from Mr. Goldstein.  I

9    want to say that we, first of all, I appreciate tremendously

10   the comments you've just made, and we hope very much that it

11   serves as a guide and reduces the amount of litigation that

12   anybody has to do going forward at other schools.

13             Also it was disturbing and alarming to hear that you

14   were out for eight weeks, and I hope that you've had a full

15   recovery and have a wonderful holiday season and 2017 and

16   onward.  We've appreciated very much your efforts in this case.

17             THE COURT:  I appreciate that.  I've still got a

18   number of treatments to go, but, you know, hopefully everything

19   will come out all right.

20             I probably should have been smart enough to take

21   senior status two years ago.  Now Judge Sargus and I have

22   decided we may have to die on the bench.

23             MR. GOLDSTEIN:  And, Judge, I wanted to tell you also

24   that Miss Dudley made the dean's list this quarter at her first

25   quarter at Louisiana Tech University.

1          THE COURT:  Oh, that's wonderful.  Give her our

2     congratulations.

3          And thanks, everybody.

4          MR. BUCKLEY:  Thank you, Your Honor.

5          UNIDENTIFIED SPEAKER:  Thank you.

6          MR. HORWITZ:  Thank you very much, Your Honor.

7          THE COURT:  Bye-bye.

8        (Proceedings concluded at 2:09 p.m.)

9                            - - -

10

11                    C E R T I F I C A T E

12          I certify that the foregoing is a correct transcript

13     from the record of the proceedings in the above-entitled

14     matter.

                              s/Julie A. Wolfer
15                            Julie A. Wolfer, RDR, CRR
                              Official Reporter

16

17

18

19

20

21

22

23

24

25